## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**MARCELL HILL**,

    Plaintiff,

v.                              Case No. 8:22-cv-1854-WFJ-MRM

**UNITED STATES OF AMERICA**,

    Defendant.

_____/

## <u>ORDER</u>

Before the Court is Defendant United States of America's Motion to Dismiss with prejudice (Dkt. 23) Plaintiff Marcell Hill's Second Amended Complaint (Dkt. 22). Ms. Hill has responded in opposition (Dkt. 24), and the United States has not replied. Upon careful review, the Court grants the United States' Motion.

## BACKGROUND

This case arises from an alleged incident that occurred at a California apartment in 1999. Dkt. 22 at 3–4. Ms. Hill claims that, after being invited to dinner by United States Marine Corps ("USMC") officers, she and her romantic partner Lt. Colonel Brian Fanning[1] "were both drugged, gang raped, sodomized, photographed, verbally threatened, and psychologically tortured with military tactics[.]" *Id.* at 4.

---

[1] According to Ms. Hill, Lt. Colonel Brian Fanning held the lower rank of Captain at the time of the alleged incident. Dkt. 22 at 4.

Ms. Hill further claims that she had no recollection of the 1999 incident until 2016. *Id.* at 5. Since then, Ms. Hill believes that various government agents and entities have joined in a conspiracy to delegitimize her in order to "protect high ranking USMC officers." *Id.* at 11. The Court recounts the facts as alleged by Ms. Hill.

## I.    Factual History

On March 28, 2016, Ms. Hill began to recall "certain peripheral events"[2] surrounding a traumatic incident that took place in 1999. *Id.* at 5. Ms. Hill made numerous attempts to reestablish contact with Lt. Colonel Fanning at this point. *Id.* Ms. Hill's attempts were presumably unsuccessful, however, as there is no indication that she gained any additional clarity concerning her unfolding memories.

Notwithstanding, Ms. Hill claims that her mere efforts to contact Lt. Colonel Fanning "triggered an intimidation and harassment campaign against her." *Id.* The campaign allegedly began with Naval Criminal Investigative Service ("NCIS") Agent Angel Cruz intimidating and threatening Ms. Hill through the phone.[3] *Id.* Ms. Hill reported Agent Cruz to the NCIS tip line, but she received no response. *Id.* at 6. Unidentified individuals then allegedly began to harass Ms. Hill by "pretending to

---

[2] Ms. Hill never specifies what "peripheral events" she recalled. Some indication concerning these recollections can be found in the attachments to the United States' Motion to Dismiss. *See* Dkt. 23-2 at 2.

[3] Ms. Hill alleges that Agent Cruz did so "at the request of Colonel Deamon of the USMC Inspector General." Dkt. 22 at 5. Colonel Deamon appears to be former Major Daniel Deamon, who was allegedly involved in the 1999 incident and coverup conspiracy that is at the center of Ms. Hill's Complaint. *Id.* at 3. This would explain why Ms. Hill states that Agent Cruz "joined the First Conspiracy" by allegedly intimidating her at the direction of "Colonel Deamon." *Id.* at 5.

be Lt. Colonel Fanning via phone and [Lt. Colonel Fanning's] military issue email." *Id.* Ms. Hill reported the harassment and "suspected hacking of Fanning's military email via the NCIS tip line[.]" *Id.* But, once again, she received no response. *Id.*

On January 19, 2020, almost four years after her initial recollection, Ms. Hill experienced the first concrete flashback of the 1999 incident. *Id.* Specifically, Ms. Hill remembered Major Daniel Deamon raping her in a La Jolla, California apartment in April 1999. *Id.* She also claims awareness of Major Deamon "issu[ing] illegal orders to his subordinates"—Captains Jack Perrin, Hank Vanderbourght, Jason Gerrin, Mando Avila, and another unidentified USMC officer—"to plan, implement, and cover up the military hazing/initiation of [Lt. Colonel] Fanning[.]"[4] *Id.* at 3. Ms. Hill suggests that Major Paul Pond was present at some point as well, but "used reasonable discretion to depart and forego further involvement." *Id.* at 4.

Following her flashback, Ms. Hill reported her victimization to Pinellas County Sheriff's Office so that "the report could be teletyped to the San Diego Sex Crimes Unit[.]" *Id.* at 9. The San Diego Police Department's ("SDPD") Sex Crimes Unit nevertheless "refused to take further statements or investigate" because "NCIS Agent Cruz . . . informed SDPD that Lt. Colonel Fanning placed a restraining order on [Ms. Hill.]" *Id.* at 7. Ms. Hill maintains that no such restraining order exists. *Id.*

---

[4] The specific nature of these subordinate officers' alleged participation is unclear from the factual allegations contained within Ms. Hill's Second Amended Complaint.

Left with "no option" due to "Agent Cruz's unlawful interference[,]" Ms. Hill reported the 1999 incident to NCIS. *Id.* Approximately two weeks after NCIS opened an investigation, however, Ms. Hill's case was allegedly closed by NCIS Agents Will Villalobos and Anna Ryan under the pretense of a statute of limitations issue. *Id.* Ms. Hill claims that it was reopened in March 2021 "after much persistence . . . due to [a] legal change." *Id.* "The re-opened NCIS investigation proceeded slowly, but [Ms. Hill] was pleased with the forward progression and monthly updates from the lead investigator Agent Antonia Spodarek." *Id.*

Unfortunately, the investigation began to suffer setbacks after Ms. Hill signed a representation agreement with Victims Legal Counsel ("VLC") Major Josh Keefe on September 4, 2021. *Id.* at 8. Major Keefe failed to obtain protective orders against the then-identified suspects or identify the remaining non-identified suspects. *Id.* In addition, Major Keefe allegedly displayed "continuous manipulative and unethical behavior." *Id.*

Eventually, Major Keefe informed Ms. Hill that "Agent Spodarek was making no progress in the investigation and that she was unable to identify the remaining two suspects." *Id.* at 9. "[B]eginning to suspect the formation of a Second Conspiracy"[5] between various government agencies, Ms. Hill worked to "uncover

---

[5] The "First Conspiracy" appears to refer to Major Deamon's alleged planning and execution of the 1999 incident. Dkt. 22 at 4. The "Second Conspiracy" appears to refer to everything that allegedly happened throughout the investigation of Ms. Hill's claims. *Id.* at 9–11.

the identity of the remaining two suspects herself." *Id.* Ms. Hill then "emailed Agent Spodarek, Major Keefe, and Major [Gabriel] Boenecke . . . in [an] attempt to potentially prevent a cover-up of the new information" she discovered. *Id.*

One month later, Ms. Hill met with Major Keefe and Agent Spodarek for a second interview[6] at MacDill Air Force Base in Tampa, Florida. *Id.* at 10. Ms. Hill thought the interview "very odd" and suspected that "she was about to be offered compensation for her damages." *Id.* at 11. Ms. Hill suggests that the purpose of such an offer—there is no indication that one ever materialized—would be to protect "high ranking USMC officers." *Id.*

"Not willing to compromise the pursuit of criminal justice in exchange for monetary damages, [Ms. Hill] filed the Standard Form 95 with supporting documentation" on January 8, 2022, "to commence the administrative process of the [Federal Tort Claims Act] for $60,000,000.00." *Id.* In addition, now "fully aware of the formation and furtherance of the Second Conspiracy[,]" Ms. Hill terminated her attorney-client relationship with Major Keefe. *Id.*

Ms. Hill claims that the Second Conspiracy only intensified as a result. Indeed, "FBI agents appeared at [Ms. Hill's] home to admonish her for sending romantic emails to [Lt. Colonel] Fanning." *Id.* And, on top of this purported

---

[6] It is not clear when the first interview between Ms. Hill, Major Keefe, and Agent Spodarek took place.

intimidation by law enforcement, the lawyers overseeing Ms. Hill's case allegedly became antagonistic. For instance, in a phone conference with Judge Advocate General ("JAG") Prosecutor Major Gabriel Boenecke, JAG Prosecutor Michael Cook, and Civilian Prosecutorial Advisor Isabel Pauley, Ms. Pauley allegedly "twisted [Ms. Hill's] words to imply that [Ms. Hill] was the individual that could potentially be harmful, not the suspects." *Id.* at 13. Major Boenecke then "advised [Ms. Hill] that she had no proof that she was in danger and [that] protective orders from the command would likely be denied." *Id.* Finally, Agent Spodarek allegedly "threatened [Ms. Hill's] sister that if [Ms. Hill] did not cease emails and social media posts containing her case details, they were going to conduct a Welfare Check on [Ms. Hill]." *Id.*

Increasingly unhappy with the progress of her case, Ms. Hill made multiple requests for more information. *Id.* at 18. They nevertheless went largely unanswered. *Id.* And it was around this time when Ms. Hill was contacted by Lt. Colonel Troy Campbell. *Id.* at 14. Lt. Colonel Campbell informed Ms. Hill that he was the new supervisory counsel[7] and scheduled a phone conference for May 23, 2022. *Id.*

 Ms. Hill contends that the phone conference was a farce. Lt. Colonel Campbell allegedly "fabricated the presence of Major Cook" as well as "the

---

[7] Ms. Hill claims that Lt. Colonel Campbell merely "impersonated the USMC JAG position of Supervisory Counsel" "in furtherance of the Second Conspiracy." Dkt. 22 at 14.

existence and presence of NCIS Agent Montgomery who Lt. Colonel Campbell falsely stated was replacing Agent Spodarek as lead investigator on the case." *Id.* Ultimately, Lt. Colonel Campbell notified Ms. Hill that "the USMC Commander(s) . . . had concluded that there was no sufficient evidence to bring charges" and that Ms. Hill's NCIS investigation was being closed." *Id.* at 14–15.

Ms. Hill consequently requested information pertaining to Agent Montgomery as well as a copy of the information gathered for her NCIS investigation. *Id.* at 15–16. Ms. Hill claims that she has yet to receive either. Ms. Hill has since filed seven Investigator General complaints against the individuals in charge of her investigation. *Id.* at 16–17. There is no indication that her case was ever re-opened.

## II.   Procedural History

On August 12, 2022, Ms. Hill brought a Complaint alleging seventeen counts of negligence which focused on the 1999 incident as well as her NCIS investigation. Dkt. 1 at 13–20. In response, the United States moved to dismiss with prejudice. Dkt. 6. "[H]esitant to consider dismissing Ms. Hill's pro se Complaint with prejudice without first giving her the opportunity to rectify [her pleading's] shortcomings[,]" the Court opted to dismiss without prejudice and allow Ms. Hill to amend her Complaint. Dkt. 12 at 11.

Ms. Hill filed her First Amended Complaint on December 30, 2022. Dkt. 13. The United States similarly moved to dismiss with prejudice. Dkt. 16. Once again, however, the Court dismissed Ms. Hill's claims without prejudice as a shotgun pleading. Dkt. 18. In so doing, the Court granted Ms. Hill a "third and final attempt to adequately plead her case." *Id.* at 12.

On March 13, 2023, Ms. Hill filed her Second Amended Complaint. Dkt. 22. Therein, Ms. Hill brings twelve causes of action pursuant to the Federal Tort Claims Act ("FTCA"): Count I—Gross Negligence against Major Deamon; Count II—Negligence against Captains Vanderbourght, Perrin, Gerrin, Avila, and an unidentified USMC officer; Count III—Negligence against Major Pond; Count IV—Conspiracy against Majors Deamon and Pond as well as Captains Vanderbourght, Perrin, Gerrin, Avila, and an unidentified USMC officer; Count V—Conspiracy against Agent Cruz; Count VI—Intentional Infliction of Emotional Distress against Agent Cruz; Count VII—Negligence against NCIS generally; Count VIII—Negligence against Agents Villalobos and Ryan; Count IX—Negligence against Major Keefe; Count X—Intentional Infliction of Emotional Distress against Major Keefe; Count XI—Negligence against Major Boenecke; and Count XII—Conspiracy against the USMC, JAG, NCIS, their representatives, and Advisor Pauley. *Id.* at 17–28.

The United States now moves to dismiss Ms. Hill's Second Amended Complaint with prejudice. Dkt. 23.

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." At the pleading stage, Rule 8 is read in conjunction with Rule 12(b)(6). *Prunty v. Arnold & Itkin LLP*, No. 2:17-cv-506-FtM-99CM, 2017 WL 5971681, at *1 (M.D. Fla. Dec. 1, 2017).

A complaint withstands dismissal under Rule 12(b)(6) if the alleged facts state a claim for relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard does not require detailed factual allegations but demands more than an unadorned accusation. *Id.* All facts are accepted as true and viewed in the light most favorable to the Plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).

At the dismissal stage, a court may consider matters judicially noticed, such as public records, without converting a defendant's motion to one for summary judgment. *See Universal Express, Inc. v. S.E.C.*, 177 F. App'x 52, 52 (11th Cir. 2006). Additionally, documents may be considered at the dismissal stage if they are central to, referenced in, or attached to the complaint. *LaGrasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004). Documents attached to a motion to dismiss

may also be considered if the documents are (1) central to the plaintiff's claim, and (2) undisputed (if their authenticity is not challenged). *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002).

## DISCUSSION

The United States presents multiple grounds—both procedural and substantial—for dismissing Ms. Hill's Second Amended Complaint with prejudice. The Court will address each in turn.

### I.     FRCP 8(a)(2) & 10(b)

The United States first argues that Ms. Hill's Second Amended Complaint violates Federal Rules of Civil Procedure 8(a)(2) and 10(b). Dkt. 23 at 4–6. The Court agrees and will not permit Ms. Hill a fourth opportunity to rectify this shortcoming.

Complaints that violate FRCP 8(a)(2) or 10(b) "are often disparagingly referred to as 'shotgun pleadings.'" *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015). The Eleventh Circuit has recognized four basic types of shotgun pleadings: (1) a complaint that contains multiple counts where each count adopts the allegations of all preceding counts; (2) a complaint that is replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action; (3) a complaint that fails to separate into different counts each cause of action or claim for relief; and (4) a complaint that asserts multiple

claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions or which of the defendants the claim is brought against. *Id.* at 1321–23. "The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* at 1323.

Here, the vague and conclusory facts contained within Ms. Hill's Second Amended Complaint leave the United States without adequate notice concerning the factual bases underlying Ms. Hill's interconnected claims. It is worth noting at the outset that Ms. Hill is attempting to hold the United States liable for the alleged acts and omissions of nineteen of its agents. These acts and omissions revolve around Ms. Hill's alleged 1999 rape and the investigation of said rape approximately twenty years later. To have adequate notice of the grounds upon which Ms. Hill's claims rest, the United States therefore needs a reasonably clear picture of what its agents supposedly did or did not do during the event which forms the foundation of Ms. Hill's Second Amended Complaint.

Ms. Hill's failure to establish such a picture is apparent through an analysis of Counts II and IV. Ms. Hill claims that "Captain(s) Vanderbourght, Perrin, Gerrin, Avila, and the unidentified USMC Officer breached their duty of care [and formed the First Conspiracy] when they carelessly failed to decipher legal from illegal orders

11

and followed Major Deamon's illegal orders to plan, implement, and coverup the hazing/initiation with non-discretionary compliance[.]" Dkt. 22 at 18, 20. The only factual grounds Ms. Hill provides for these claims, however, is that "Major Deamon recklessly issued illegal orders to his subordinates" in April 1999 and that "Captain(s) Vanderbourght, Perrin, Gerrin, Avila, and the unidentified officer were acting within the scope of their duties . . . when they carelessly failed to decipher legal from illegal orders and followed Major Deamon's illegal orders[.]" Dkt. 22 at 3. It follows that the factual bases of Counts II and IV are conclusory statements which merely recite the elements of negligence and conspiracy. Indeed, Ms. Hill never specifies any of the individual actions these subordinate officers allegedly took beyond their collective decision to follow illegal orders. Nor does Ms. Hill meaningfully specify what these supposed orders were or how she is aware of them. The only clear allegations are that Major Deamon raped Ms. Hill and that the other officers were somehow part of his plan to do so. Such ambiguity functionally prohibits the United States from mounting anything but a collective blanket defense of all five subordinate officer's actions. And this in turn limits the United States' ability to properly defend itself against the rest of Ms. Hill's claims, which all fundamentally rely on her rape allegations. Simply put, in a complex case spanning multiple decades such as this one, more is required than mere conclusory allegations which double as legal conclusions.

This particular issue is only compounded in relation to Major Pond; for, the only factual assertion pertaining to him is that, at some point, "he used reasonable discretion and opted to leave and no longer personally participate in the hazing/initiation, but failed to exercise his authority to intervene[.]" *Id.* at 4. Ms. Hill never clarifies when he was allegedly present, how he participated, what he knew of the conspiracy, or when he left. Notwithstanding, Ms. Hill later asserts in Count IV that Major Pond "engaged in overt acts to further the conspiracy[.]" *Id.* at 20. What overt acts he allegedly engaged in are wholly unspecified. It appears that Ms. Hill expects the Court to incorporate allegations from her prior complaints to fill some of these gaps.[8] Unfortunately, the Court cannot selectively pick and choose factual allegations from dismissed complaints in order to complete her narrative. The vague and conclusory statements she makes in relation to Major Pond are insufficient to put the United States on notice of the grounds upon which her claims against him (Counts III and IV) rest.

Finally, the rest of Ms. Hill's Second Amended Complaint is replete with similarly conclusory averments that conveniently tie Ms. Hill's narrative together without explanation. For instance, Ms. Hill connects Agent Cruz to the First Conspiracy merely by claiming that Major Deamon contacted him at some point and

---

[8] In Ms. Hill's First Amended Complaint, she claims that Major Pond was "present when the hazing incident occurred." Dkt. 13 at 4.

"persuaded him to join the First Conspiracy formed in 1999[.]" *Id.* at 21. This alone comprises the entire basis for Count V. Ms. Hill then asserts negligence against Agents Ryan and Villalobos in Count VIII for carelessly applying a statute of limitations precedent to her case despite simultaneously suggesting that there was a "legal change" underlying NCIS's decision to reopen it. *Id.* at 7, 24. These two parts do not form a coherent whole.

The Court will not go through the exercise of identifying each issue contained within Ms. Hill's Second Amended Complaint. Suffice it to say, pleading defects predominate Ms. Hill's claims by leaving the United States in the position of refuting an ocean of conclusory and unexplained assertions that ambiguously connect her claims to alleged conspiracies. And this is not to mention what is perhaps the greatest incoherency in Ms. Hill's Second Amended Complaint; namely, Ms. Hill apparently knew nothing until 2020, at which point she knew everything. Dkt. 24 at 6–11.

These issues collectively constitute grounds for dismissal. *See Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018) (noting how shotgun pleadings, such as the instant one, inexorably broaden the scope of discovery, wreak havoc on court dockets, and undermine respect for the courts). The United States cannot be expected to defend itself from claims of vast conspiracies without more insight into how Ms. Hill is reaching the legal conclusions that she puts forth as fact.

Given the seriousness of Ms. Hill's allegations and her pro se status, however, the Court will also address the substantive grounds raised by the United States.

## II.   28 U.S.C. § 2680(h)

The first substantive ground raised by the United States is 28 U.S.C § 2680(h). The United States argues that, thereunder, Ms. Hill's claims are barred. Dkt. 23 at 6–9. The Court agrees as to Counts I–VI and X.

"It is well settled that the United States, as a sovereign entity, is immune from suit unless it consents to be sued." *Zelaya v. United States*, 781 F.3d 1315, 1321 (11th Cir. 2015) (collecting cases). When the United States provides such consent, it "has the power to condition a waiver of its immunity as broadly or narrowly as it wishes, and according to whatever terms it chooses to impose." *Id.* at 1321–22 (citation omitted). Accordingly, "a court must strictly observe the limitations and conditions upon which the Government consents to be sued and cannot imply exceptions not present within the terms of the waiver." *Id.* at 1322 (citations and internal quotations omitted).

Ms. Hill brings her claims against the United States pursuant to the FTCA's qualified waiver of sovereign immunity. *See Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 485 (2006) ("The FTCA qualifies its waiver of sovereign immunity for certain categories of claims (13 in all)."). The FTCA's relevant waiver exceptions are found in § 2680(h), which provides in pertinent part that:

> The provisions of this chapter and section 1346(b) of this title shall not apply to . . . [a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights: *Provided*, That, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution.

"If one of the exceptions applies, the bar of sovereign immunity remains." *Dolan*, 546 U.S. at 485.

Counts I–VI and X arise out of intentional torts explicitly exempted from the FTCA's waiver (assault, battery, and misrepresentation). The bar of sovereign immunity therefore remains as to these claims. As the Eleventh Circuit has explained, "the phrase 'arising out of' should be broadly construed," *Metz v. United States*, 788 F.2d 1528, 1533 (11th Cir. 1986) (citation omitted), and a claimant "cannot avoid the reach of § 2680(h) by framing her complaint in terms of [non-exempted claims]." *Id.* (quoting *United States v. Shearer*, 473 U.S. 52, 55 (1985)). Counts I–III represent a blatant attempt to reframe Ms. Hill's alleged assault and battery (and the failure to prevent it) as gross negligence and negligence. Dkt. 22 at 17–20. Counts IV and V also arise out of assault and battery because the underlying assault and battery is essential to Ms. Hill's conspiracy claims therein; indeed, the primary act done in furtherance of the First Conspiracy was the alleged assault and battery of Ms. Hill and Lt. Colonel Fanning. *Id.* at 20–22; *see Metz*, 788 F.2d at 1534

16

(finding that "a cause of action which is distinct from one of those excepted under §
2680(h) will nevertheless be deemed to 'arise out of' an excepted cause of action
when the underlying governmental conduct which constitutes an excepted cause of
action is 'essential' to plaintiff's claim."); *see also Cohen v. McGuire*, No. 3:15-CV-
133-J-34JRK, 2016 WL 3188889, at *9 (M.D. Fla. June 8, 2016) (citation omitted)
(finding that "[t]he elements of a civil conspiracy are: (1) a conspiracy between two
or more parties, (2) to do an unlawful act or a lawful act by unlawful means, (3) the
doing of some overt act in pursuance of the conspiracy, and (4) damage to plaintiff
as a result of the act performed pursuant to the conspiracy.") (cleaned up). Lastly,
Counts VI and X directly arise out of misrepresentation (another exempted claim).
This is because the intentional infliction of emotional distress Ms. Hill claims in both
Counts VI and X is wholly predicated on the alleged misrepresentations of Agent
Cruz and Major Keefe. Dkt. 22 at 22, 25. Counts I–VI and X must therefore be
dismissed with prejudice under § 2680(h).

### III.   28 U.S.C. § 2401(b)

Counts I–IV, as well as Count VII, are also untimely. Under Section 2401(b):

A tort claim against the United States shall be forever barred unless it
is presented in writing to the appropriate Federal agency within two
years after such claim accrues or unless action is begun within six
months after the date of mailing, by certified or registered mail, of
notice of final denial of the claim by the agency to which it was
presented.

"The general rule is that a claim under the FTCA accrues at the time of injury." *Diaz v. United States*, 165 F.3d 1337, 1339 (11th Cir. 1999) (citing *United States v. Kubrick*, 444 U.S. 111, 120 (1979)). Still, "[i]n certain situations, such as medical malpractice, the [FTCA] claim may accrue at a later date . . . when the plaintiff is, or in the exercise of reasonable diligence should be, aware of both her injury and its connection with some act of the defendant."[9] *Id.* A plaintiff in such circumstances, however, "may not bury her head in the sand once she is put on notice that the government may have caused her injury." *Id.*

Even assuming that Counts I–IV qualify as a special situation wherein Ms. Hill's claims accrue after the time of her injury due to alleged amnesia,[10] her claims are still untimely. As an initial matter, Ms. Hill must have known that she was injured in the days following her alleged sexual assault. Ms. Hill claims that "recalling injuries such as vaginal and rectal bleeding, bodily bruising, severe abdominal, hip, SI, neck, and back pain experienced in days after the gang rape took well into 2020, 2021, 2022[.]" Dkt 24 at 8. This means that, days after the 1999 incident, when she was no longer under the influence of "amnesiac substances," Ms. Hill experienced manifested injuries consistent with rape. *Id.* It is simply implausible to maintain

---

[9] Either way, because "the accrual of a cause of action under § 2401(b) is a matter of federal law[,]" the Eleventh Circuit has rejected "incorporating state tolling provisions" to Section 2401(b). *Phillips v. United States*, 260 F.3d 1316, 1319 (11th Cir. 2001). The California "Delayed Discover Rule" Ms. Hill points to is therefore inapplicable here. Dkt. 22 at 2; Dkt. 24 at 8.

[10] The Court is unaware of any authority that would support such a finding for sexual assault-based claims under the FTCA.

otherwise, even accepting as true that Ms. Hill was "suffering from trauma induced Dissociative Amnesia[.]" *Id.* Amnesia does not erase awareness of present injury.

At this point, Ms. Hill consequently had a duty to begin exercising reasonable diligence to ascertain the physical cause of her injuries. Ms. Hill claims to have done so by seeking medical care. She states that she "had many unsuccessful visits with an array of medical and mental health practitioners from 1999 to 2020 with no fruitful determination of the etiology of her physical and psychological ailments." *Id.* at 8. While it strains credence to accept that an entire array of medical professionals failed to once suggest rape as the cause of Ms. Hill's injuries, in similar circumstances, the Supreme Court has nevertheless "discern[ed] no sound reason for visiting the consequences of such an error on the defendant by delaying the accrual of the claim until the plaintiff is otherwise informed." *Kubrick*, 444 U.S. at 124. Ms. Hill therefore had a duty to begin exercising reasonable diligence to find out who caused her physical injuries as well.

There is no indication that Ms. Hill ever sought this information out. She does not claim to have contacted Lt. Colonel Fanning to talk about her issues. She did not contact law enforcement. And, accepting Ms. Hill's allegations as true, Ms. Hill appears to have done nothing except seek medical help for injuries wholly consistent with rape. Then, in 2016 when Ms. Hill began recalling "certain peripheral events" surrounding the 1999 incident, she failed to investigate the connection between her

injuries and the alleged incident that she initially remembered from that night. For someone on a twenty-year mission to uncover answers concerning her alleged injuries, this failure to investigate can only be described as Ms. Hill ignoring clear facts. Ms. Hill's alleged amnesia does not change this fact.

Thus, under the most generous interpretation of the alleged facts, Ms. Hill should have been aware of both her injury and its connection with some act of the United States by mid-2016 (or mid-2017 at the latest). To hold otherwise would be to construe § 2401(b) so as to defeat its purpose. This the Court cannot do. *See Kubrick*, 444 U.S. at 117 ("we are not free to construe [§ 2401(b)] to defeat its obvious purpose, which is to encourage the prompt resolution of claims.").

All the same, Ms. Hill did not submit her Standard Form 95 until January 8, 2022. Dkt. 22 at 11. January 2022 is well beyond two years after 2016 or 2017. Counts I–V are therefore forever barred under § 2401(b).

The same is also true in relation to Count VII. There, Ms. Hill claims that NCIS breached its duty of care when it failed to "respond to, investigate, and issue proper discipline of the criminal complaints [Ms. Hill] made to [NCIS] on Agent Cruz's actions in 2017." *Id.* at 23. As previously mentioned, Ms. Hill did not submit her Standard Form 95 until January 8, 2022. Accordingly, even assuming that Ms. Hill did not realize her injury for over a year (and that accrual for such a claim could be tolled), Count VII is still late by approximately two years.

**IV.    28 U.S.C. § 2680(a)**

This brings the Court to § 2680(a). The United States contends that the discretionary function exception therein bars Counts III and VI–XII. Dkt. 23 at 13–15. The Court agrees, but only as to Counts VIII, IX, and XI.

Section 2680(a) bars any FTCA claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." The Supreme Court has clarified a "two-part test for determining whether the government's conduct falls within the scope of the discretionary function exception." *Autery v. United States*, 992 F.2d 1523, 1526 (11th Cir. 1993) (citing *United States v. Gaubert,* 499 U.S. 315, 322–23 (1991)). First, the Court must "determine whether the challenged act or omission violated a mandatory regulation or policy that allowed no judgment or choice." *Id.* (citation omitted). Second, if the challenged conduct involved an element of judgment or choice, the Court must determine "if the challenged actions are the kind of conduct that the discretionary function exception was designed to shield." *Id.* (citations and internal quotations omitted). Shielded conduct includes discretionary judgments or choices "grounded in considerations of public policy" such as social, economic, or political concerns. *Mesa v. United States*, 123 F.3d 1435, 1438 (11th Cir. 1997) (citations omitted).

To begin, the conduct Ms. Hill challenges through Counts VIII, IX, and XI involved an element of discretionary judgment or choice. Count VIII challenges Agents Ryan and Villalobos' allegedly negligent decision to initially close Ms. Hill's investigation due to a perceived statute of limitations issue. Dkt. 22 at 24. Count IX challenges Major Keefe's alleged negligent failure to get protective orders and keep Ms. Hill informed. *Id.* at 25. And Count XI challenges Major Boenecke's allegedly negligent decisions to not answer questions, not pursue a protective order, and to conduct a welfare check on Ms. Hill. *Id.* at 26–27. No government policy or regulation mandates non-discretionary action in relation to decisions to open or close an investigation, pursue protective orders, withhold information during an investigation, or conduct a welfare check. It is therefore clear that these actions did not violate any mandatory regulation or policy that provided for no judgment or choice. Decisions such as these are inherently discretionary in nature. *See Mesa v. United States*, 837 F. Supp. 1210, 1213 (S.D. Fla. 1993), *aff'd*, 123 F.3d 1435 (11th Cir. 1997) (finding that "[t]he overwhelming consensus of federal case law establishes that criminal law enforcement decisions—investigative and prosecutorial alike—are discretionary in nature and, therefore, by Congressional mandate, immune from judicial review").

Moreover, these are precisely the kind of acts and omissions that the discretionary function exception was designed to shield. Indeed, "the ability of an

investigator to choose the way in which an investigation will proceed is undoubtedly grounded in considerations of public policy." *Littell v. United States*, 191 F. Supp. 2d 1338, 1345 (M.D. Fla. 2002). The relevant considerations here include, among other things, the allocation of resources, the possible repercussions of identifying suspects without meaningful evidence against them, the threat (or lack thereof) to the alleged victim, and the possible threat an alleged victim poses to herself or others. The actions challenged in Counts VIII, IX, and XI therefore fall within the discretionary function exemption. As a result, they are immune from judicial review. *See Gaubert*, 499 U.S. at 323 ("the purpose of the exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort").[11]

## V.     FRCP 12(b)(6)

The United States next argues that Ms. Hill has failed to state claims for gross negligence, negligence, or conspiracy. Dkt. 23 at 16. Because Counts I–XI have already been dismissed on both procedural and substantive grounds, however, the Court will limit its analysis of the United States' Rule 12(b)(6) argument to Count XII.

---

[11] The other Counts which the United States seeks to dismiss under § 2680(a) involve alleged intentional attempts to deprive Ms. Hill of due process by engaging in a vast conspiracy to delegitimize her and her claims. Such actions are clearly not the kind of acts that the discretionary function exception was designed to shield from review.

"[D]etermining whether a complaint states a plausible claim is context specific, requiring the reviewing court to draw on its experience and common sense." *Ashcroft*, 556 U.S. at 664. In so doing, a court "may begin by identifying allegations that, because they are mere conclusions, are not entitled to the assumption of truth." *Id.* "While legal conclusions can provide the complaint's framework, they must be supported by factual allegations." *Id.*

That said, Ms. Hill's claim that "[a] Second Conspiracy was formed by the USMC, JAG Office, and NCIS and their representatives to suppress evidence, obstruct justice, and intimidate and delegitimize the Plaintiff to protect the high-ranking USMC officers" is not plausibly supported by factual allegations. Dkt. 22 at 27–28. This much is clear from a close inspection of Ms. Hill's alleged transition from "suspect[ing] the formation of a Second Conspiracy" to being "fully aware of the formation and furtherance of the Second Conspiracy[.]" *Id.* at 9, 11. Indeed, Ms. Hill essentially claims that the tipping point at which she became convinced of a vast inter-agency conspiracy against her was an "odd" interview. *Id.* at 11.

More importantly, Ms. Hill wholly fails to connect any of the alleged conspirators to each other or the goal of protecting USMC officers through factual assertions. The only connection she offers are conclusory statements which assert that the alleged conspirators were all negligent in relation to her investigation. Ms. Hill therefore argues that, because all of these individuals and agencies were

negligent in relation to an investigation of USMC officers, they must be conspiring to protect USMC officers. This is possible but, without more, it is not plausible. Such conclusory claims of negligence are not entitled to the presumption of truth. *Ashcroft*, 556 U.S. at 664.

Because Count XII represents complete speculation based on conclusory averments, common sense and experience dictate a finding of implausibility.[12] The Court dismisses Count XII with prejudice, as Ms. Hill has had three opportunities to properly allege this claim and has failed to do so.

## CONCLUSION

The disturbing allegations put forth by Ms. Hill have demanded the Court's utmost attention. Notwithstanding, for the reasons expressed above, Ms. Hill has failed to state any claims upon which relief can be granted. Amendment would be futile.

Accordingly, it is hereby **ORDERED** and **ADJUDGED**:

(1) The United States' Motion to Dismiss with prejudice (Dkt. 23) is **GRANTED**.

---

[12] The United States also argues that Majors Keefe and Boenecke are entitled to absolute immunity as prosecutors. The problem with this argument is that "absolute immunity does not apply when a prosecutor gives advice to police during a criminal investigation" or is otherwise engaged in "investigative or administrative tasks." *Van de Kamp v. Goldstein*, 555 U.S. 335, 342–43 (2009). Ms. Hill's allegations appear to concern the investigative and administrative roles Major Keefe and Boenecke played during her investigation. Moreover, it does not appear that anything they are alleged to have done was intimately associated with the judicial phase of the criminal process, as Ms. Hill's case never progressed to that phase.

(2)  Ms. Hill's Second Amended Complaint (Dkt. 22) is **DISMISSED WITH**

**PREJUCIDE**. The Clerk is directed to enter judgment in favor of the

United States against Ms. Hill and close this case.

**DONE AND ORDERED** at Tampa, Florida, on April 10, 2023.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO**:
Counsel of Record
Plaintiff, pro se

26